Roger N. Behle, Jr. (174755)
Jordan A. Liebman (317930)
Luis A. Saenz (336311)
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, CA 93101
Tel:   (714) 556-1700
Fax:   (714) 546-5005
Email: rbehle@foleybezek.com
liebman@foleybezek.com
lsaenz@foleybezek.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DELOREAN MOTOR COMPANY, a Texas corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>NBCUNIVERSAL MEDIA LLC, a Delaware limited liability company, and DOES 1 through 50, inclusive,<br><br>                    Defendants. | Case No.: 8:22-cv-02189-DOC-DFM<br><br>Hon. David O. Carter<br>Magistrate Judge Douglas F. McCormick<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNAIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:     Feb. 12, 2024<br>Time:    10:00 am<br>Courtroom: 6B |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARD............................................................................2

III.  ARGUMENT .......................................................................................3

   A.    The Court should deny the MSJ because NBC failed to timely produce witnesses for deposition before it filed the MSJ. ...................................................3

   B.    There are disputed issues of fact as to the breach of contract claim...........8

      i.    DMC is presumed the rightful owner of the trademarks and related rights at issue..................................................................................8

      ii.   Federal courts held DMC owns the rights at issue. .....................................8

      iii.  NBC misrepresents DMC's statements in the DeLorean Estate lawsuit....11

      iv.   DMC independently established its own rights in the subject trademarks. 13

      v.    NBC cannot challenge DMC's rights after recognizing them and expressly making royalty payments under the 1989 Agreement. .....................................13

      vi.   NBC's "true-up" royalty payments made from 2017 through 2021, as well as its continuing tender of performance under the 1989 Agreement through 2021, precludes its statute of limitations defense. ...........................................15

      vii.  NBC breached the 1989 Agreement and failed to pay DMC royalties it agreed to pay. ....................................................................17

   C.    The accounting claim survives................................................................20

   D.    There are disputed issues of fact as to the trademark and trade dress infringement claim. .............................................................20

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

i.   DMC may bring contract and infringement claims. ..................................20

ii.  NBC's attempt to challenge DMC's trademark fails..................................21

iii. There is a clear likelihood of confusion. ....................................22

IV. CONCLUSION ................................................................25

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## STATE CASES

*Fuentes v. Empire Nissan, Inc.*,
   90 Cal. App. 5th 919 (2023).........................................................................13, 14

*Mills v. Forestex Co.*,
   108 Cal. App. 4th 625 (2003).............................................................................16

*Romano v. Rowell Internat., Inc.*,
   14 Cal. 4th 479 (1996)......................................................................................17

## FEDERAL CASES

*Adobe Sys. v. Kern*,
   No. C 09-1076 CW (JL), 2009 U.S. Dist. LEXIS 123566 (N.D. Cal. Nov. 24,
   2009)................................................................................................................24

*Advanced BioTech, Ltd. Liab. Co. v. BioWorld USA, Inc.*,
   No. 1:19-cv-01215 JLT SKO, 2022 U.S. Dist. LEXIS 76213 (E.D. Cal. Apr. 26,
   2022)..............................................................................................................8, 21

*Ambat v. City & County of San Francisco*,
   757 F.3d 1017 (9th Cir. 2014)..............................................................................3

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979)..............................................................................24

*BD Performing Arts v. B.A.C. Musical Instruments, LLC*,
   No. 22-cv-02050-JSW, 2022 U.S. Dist. LEXIS 74787 (N.D. Cal. Apr. 25, 2022)
   .......................................................................................................................20

*Celotext Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................3

*Chrysler Motors Corp. v. Alloy Auto. Co.*,
   661 F. Supp. 191 (N.D. Ill. 1987).................................................................14, 21

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*City-Core Hosp., LLC v. Palmer*,
  No. 17-cv-05544-CRB, 2018 U.S. Dist. LEXIS 6140 (N.D. Cal. Jan. 12, 2018)21

*DeLorean v. DeLorean Motor Co. (Tex.)*,
  No. 18-8212 (JLL)) 2018 U.S. Dist. LEXIS 175874 (D.N.J. Oct. 11, 2018)........9

*DeLorean v. DeLorean Motor Co. Tex. (In re DeLorean)*,
  792 F. App'x 227 (3d Cir. 2019)................................................................9

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
  771 F.3d 1119 (9th Cir. 2014)..................................................................2

*Gray v. Khoo*,
  No. 1:20-cv-01047-DAD-SAB (PC), 2022 U.S. Dist. LEXIS 57817 (E.D. Cal.
  Mar. 29, 2022) ......................................................................................4

*In re Real Estate Assocs. P'ship Litig.*,
  223 F. Supp. 2d 1109 (C.D. Cal. 2002).....................................................3

*JL Bev. Co., LLC v. Jim Beam Brands Co.*,
  828 F.3d 1098 (9th Cir. 2016)................................................................22

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004)..................................................................4

*Longwell Textiles v. Matrix Int'l Textile*,
  No. 2:19-cv-09904-SVW-AGR) 2020 U.S. Dist. LEXIS 189373 (C.D. Cal. Sep.
  4, 2020) ...............................................................................................4

*M2 Software, Inc. v. Madacy Entm't*,
  421 F.3d 1073 (9th Cir. 2005)................................................................24

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006)..................................................................2

*Nat'l Bank of Cal. v. Progressive Cas. Ins. Co.*,
  938 F. Supp. 2d 919 (C.D. Cal. 2013).......................................................3

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*Philippe Charriol Int'l Ltd. v. A'lor Int'l Ltd.*,
No. 13CV1257-MMA-BGS, 2014 U.S. Dist. LEXIS 200727 (S.D. Cal. Apr. 10,
2014) ............................................................................................................14, 21

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012) ............................................................................22

*Robert Trent Jones II, Inc. v. GFSI, Inc.*,
537 F. Supp. 2d 1061 (N.D. Cal. 2008) .............................................................25

*SafeWorks, LLC v. Teupen Am., LLC*,
717 F.Supp.2d 1181 (W.D. Wash. 2010) ............................................................24

*Waldridge v. American Hoechst Corp.*,
24 F.3d 918 (7th Cir. 1994) ...................................................................................3

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
602 F.3d 1108 (9th Cir. 2010) ...............................................................................8

## **RULES & ORDERS**

Fed. R. Civ. P. 56(a) ...........................................................................................2, 4

Fed. R. Civ. P. 8(d) .................................................................................................21

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This is a case involving "Hollywood Accounting." Defendant NBCUniversal Media, LLC ("Defendant" or "NBC") has failed to compensate DeLorean Motor Company ("Plaintiff" or "DMC") for the use of DMC's valuable DELOREAN trademarks and trade dress in a wide range of *Back To The Future* commercial products. NBC does not dispute such use, or that it continues to generate substantial revenue from the exploitation of DMC's DELOREAN trademarks and trade dress, nor that it has done so for decades. However, as NBC's own evidence shows, NBC has ignored DMC's accounting inquiries, including questions as to how royalties have been calculated. Rather, NBC has paid royalties only on products that *NBC alone* has determined are eligible. In short, NBC has excluded, and has therefore failed to pay DMC royalties on, sales of *Back To The Future* products that NBC unilaterally determines do not feature "enough" DELOREAN intellectual property. NBC has also deducted from these payments "expenses" it claims to have incurred, but without any explanation or verification that the claimed expenses are attributable to DELOREAN-related products. Making matters worse, NBC has refused to pay any royalties to DMC since 2021, despite earlier paying royalties to DMC and agreeing to do so on a continuing basis.

Furthermore, as also shown by NBC's own evidence in support of its motion for summary judgment ("MSJ"), serious questions have been raised by DMC about the accuracy and completeness of those accountings and payments NBC has made in the past. NBC's failure to answer those questions prompted the present lawsuit. Caught with its hand in the cookie jar, NBC now takes the absurd position that it owes DMC *nothing* and, therefore, summary judgment is proper. But NBC cannot disavow the 1989 license agreement governing DELOREAN trademarks ("1989 Agreement") (ECF 40-1), which the United States Court for the District of New Jersey earlier ruled inures to the benefit of DMC. Nor can NBC disavow its own conduct over the past several years. Until the filing of the MSJ, NBC claimed it had

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

been fully complying with the terms of the 1989 Agreement since 2017 and was properly accounting and paying royalties to DMC. Having assumed the duties under the 1989 Agreement to accurately compensate DMC for the use of DMC's DELOREAN trademarks and trade dress, NBC cannot dodge that obligation now by disavowing the 1989 Agreement and using DMC's marks for free. Yet that is exactly what NBC claims in its MSJ.

Moreover, if NBC did not have a license to use the DELOREAN trademarks and trade dress (under the 189 Agreement or otherwise), then DMC has a clear infringement claim against NBC for its unauthorized use of DMC's marks. Additionally, NBC has asserted that some of its uses of the DELOREAN trademarks and trade dress are outside of the 1989 Agreement, and as to those uses it does not have to compensate DMC. But if that were true, any use outside of the 1989 Agreement would be subject to DMC's trademark infringement claims.

Summary judgment simply is not warranted here, where NBC's own statements and conduct acknowledge its breaches of the 1989 Agreement and infringement. Moreover, there are significant disputed issues of material fact regarding these issues. As such, the MSJ should be denied.

## II.   LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The court views the evidence in the light most favorable to the non-moving party to determine if there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). "The court draws all justifiable inferences in favor of the non-moving party." *Id.* "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the

non-movant's favor." *Id.* "Summary judgment is improper 'where divergent ultimate inferences may reasonably be drawn from the undisputed facts.'" *Id.* (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006)).

Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issues[1] of material fact. *Nat'l Bank of Cal. v. Progressive Cas. Ins. Co.*, 938 F. Supp. 2d 919, 924 (C.D. Cal. 2013); *see Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).

While the moving party's burden is heavy, the burden on the non-moving party opposing summary judgment is not. The party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party can rely on declarations, affidavits, or any of the other forms of evidence set forth in Rule 56(c). *See id.* And "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## III.  ARGUMENT

### A. The Court should deny the MSJ because NBC failed to timely produce witnesses for deposition before it filed the MSJ.

Despite being served with a deposition notice on October 5, 2023 (ECF 30-1 at 3), NBC serially delayed producing any witnesses for deposition until after it filed

---

[1] The terms "genuine issue" and "triable issue" mean the same thing and are used interchangeably by courts in the Ninth Circuit and in this Opposition. *See, e.g.*, *In re Real Estate Assocs. P'ship Litig.*, 223 F. Supp. 2d 1109, 1118–19, 1127 (C.D. Cal. 2002).

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

the MSJ. [2] This was by design and NBC should not be rewarded for its gamesmanship. The upshot is that DMC has been prejudiced by NBC's delay, including having to write the present Opposition while its counsel takes these depositions. For this reason alone, the MSJ should be denied.

Per Federal Rule of Civil Procedure 56(d), if the party opposing a motion for summary judgment shows by affidavit or declaration that it cannot present facts needed to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d).

"[S]ummary judgment is disfavored where relevant evidence remains to be discovered." *Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004). In *Jones*, the Ninth Circuit held that the district court abused its discretion on granting summary judgment on one of the plaintiff's claims because the plaintiff "acted diligently and reasonably in pursuing discovery" and the outstanding discovery would have discovered "additional relevant evidence." *Jones*, 393 F.3d at 930.

In cases where a summary judgment motion is filed before the taking of a relevant deposition, the motion may be denied. In one case, the court held that, "based on the fact that Plaintiff filed the motion for summary judgment prior to the taking of her deposition and prior to the completion of necessary discovery," the motion had to be denied. *Gray v. Khoo*, No. 1:20-cv-01047-DAD-SAB (PC), 2022 U.S. Dist. LEXIS 57817, *4 (E.D. Cal. Mar. 29, 2022). In another case, a Rule 30(b)(6) deposition was noticed, but was not yet taken. *Longwell Textiles v. Matrix Int'l Textile*, No. 2:19-cv-09904-SVW-AGR) 2020 U.S. Dist. LEXIS 189373, *4 (C.D. Cal. Sep. 4, 2020). The court held that this, along with other outstanding discovery, mandated denial of the summary judgment motion. *Id.* at *6–7. This was

---

[2] When NBC failed to produce one of its 30(b)(6) designees for deposition at the agreed-upon date, DMC was forced to bring a motion to compel, which resulted in the Magistrate Judge's issuance of the Order at ECF 32.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

so even though the nonmovant's arguments as to the necessity of the deposition and discovery was "not . . . incredibly strong." *Id.* at \*7. The fact is that a court "cannot grant summary judgment where relevant evidence is outstanding unless that evidence would be 'fruitless.'" *Id.*

Here, NBC knew (but did not disclose to DMC) that it intended to file the present MSJ. Instead, NBC kept that a secret and serially delayed producing its witnesses for deposition until after the MSJ was filed. Had NBC disclosed its intention to file the MSJ when it first received DMC's deposition notices on October 5, 2023, DMC could have sought relief from the Magistrate Judge much earlier. Instead of producing the witnesses on the dates noticed, NBC sought cooperation from DMC's counsel to select mutually convenient dates. After some back-and-forth, NBC's counsel confirmed the availability of three 30(b)(6) witnesses for deposition on November 28 and December 4, 2023. ECF 30-1 at 3–4. These witnesses were Scott McQuown, Don Sohn, and Rei Minasian. *Id.*

On November 27, 2023, the day before the first of the depositions, counsel for NBC wrote to say they "needed more time" to compile and produce the documents needed for the deposition, and therefore requested that the Minasian and Sohn depositions (set for November 28, 2023) be reset to a date after NBC produced the necessary documents. Declaration of Roger N. Behle, Jr. ("Behle Dec."), ¶ 4, Ex. 2. Plaintiff's counsel agreed to reset the Sohn and Minasian depositions, but there was no similar discussion or agreement for the December 4, 2023, deposition of McQuown. On that day, neither McQuown nor NBC's counsel appeared, and DMC took a non-appearance of McQuown. *Id.* at ¶ 5. Subsequently, DMC's counsel on numerous occasions requested new dates for the 30(b)(6) depositions from NBC. *Id.*

No such dates were provided and on December 26, 2024, DMC filed a motion to compel the depositions. *See* ECF 30. That motion was withdrawn once NBC finally confirmed dates for the 30(b)(6) depositions. ECF 31. NBC did not notify DMC of its intended MSJ, or the grounds therefor, until January 3, 2024. Behle Dec.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

¶ 8, Ex. 4. NBC then filed the MSJ on January 12, 2024, setting the hearing for February 12, 2024, giving DMC the least amount of time possible to prepare its opposition. Consistent with its sandbagging strategy, NBC offered to produce McQuown on January 17, 2024, and Sohn the following day. Behle Dec. ¶ 6, Ex. 3. Minasian was proposed for January 10, 2024, but was then scheduled for January 18, 2024. Behle Dec. ¶¶ 6–7, Ex. 3. DMC finally took the deposition of McQuown as an individual and 30(b)(6) witness on January 17, 2024. *Id.* at ¶ 9. DMC similarly took the individual and 30(b)(6) depositions of Sohn and Minasian the next day. *Id.* Plaintiff's counsel ordered expedited transcripts for these depositions. *Id.* On January 21, 2024—a Sunday and the day before DMC's Opposition was due—DMC received transcripts for the Sohn and Minasian depositions, which were not signed by the deponents. *Id.* at ¶ 10. And on January 22, 2024, DMC received the transcript for the McQuown deposition, which was similarly not signed by the deponent. *Id.*

With the depositions of key witnesses—i.e., including NBC's 30(b)(6) witness—being serially delayed by NBC until after the filing of the MSJ, DMC obviously has not had the opportunity to marshal all facts and evidence for its opposition. The depositions of these witnesses are relevant to the MSJ and are necessary for opposing that motion. For example, these depositions seek testimony from NBC's corporate representatives on the topics that are directly relevant to the issues raised in the MSJ, such as (1) the payment of royalties in accordance with the terms of the 1989 Agreement, and (2) the method of calculation of royalties assessed to be paid by NBC under the 1989 Agreement. ECF 30-1 at 9–10.

Moreover, NBC identified the 30(b)(6) deponent as possessing material information relevant to the MSJ in its Rule 26(a)(1) initial disclosures. NBC identified McQuown as its "Senior Vice President of Financial Contract Reporting for Universal Participations Group," with knowledge of reporting practices for licenses and commercial tie-ups and preparation of royalty statements and payments to DMC. Behle Dec., ¶ 13, Ex. 7 at 2. NBC identified Sohn as its "Vice President of

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Theatrical Reporting for Universal Participations Group," with knowledge of the same topics, as well as communications with DMC. *Id.* And Minasian is NBC's "Director of Accounting and Reporting in Global Finance for Universal Products & Experiences," with knowledge of royalties and licenses related to the *Back to the Future* time machine car. *Id.*

In its MSJ, NBC challenges DMC's right to receive royalties under the 1989 Agreement, makes assertions regarding licensing by NBC related to the DELOREAN automobile and DMC's trademarks, and claims that DMC lacks evidence supporting damages from the lack of royalty payments, among other things. The positions held by the deponents, their knowledge, and the 30(b)(6) topics all relate to these issues. Thus, these depositions, and the transcripts from them, are indisputably necessary to oppose the MSJ. Moreover, NBC relies substantially on the declarations of McQuown and Sohn in support of the MSJ. *See* ECF 38-3, 38-5. As NBC admits, these witnesses are directly relevant to the MSJ.

DMC acted diligently to schedule and take the depositions but was foiled by NBC's dilatory conduct and refusal to timely produce witnesses. It took a motion to compel to get the depositions finally scheduled. DMC should not be punished for NBC's gamesmanship. Even with these depositions occurring on the eve of the deadline for DMC's Opposition, that is wholly inadequate time for DMC to analyze and present this material in its Opposition to the MSJ. Even with ordering the transcripts on an expedited basis, DMC received the deposition transcripts for two out of three witnesses the day before its Opposition was due (a Sunday) and received the remaining transcript on the Opposition deadline. Behle Dec. ¶ 10.

Given that the depositions of the most critical witnesses of the case, NBC's corporate representatives, only occurred after the MSJ was filed, the MSJ should be denied. At the very least, consideration of the MSJ should be postponed to provide DMC with sufficient time to file an amended Opposition based on the just issued transcripts.

**B. There are disputed issues of fact as to the breach of contract claim.**

       *i.*  <u>*DMC is presumed the rightful owner of the trademarks and related rights at issue.*</u>

     "Federally registered trademarks have a presumption of ownership and priority." *Advanced BioTech, Ltd. Liab. Co. v. BioWorld USA, Inc.*, No. 1:19-cv-01215 JLT SKO, 2022 U.S. Dist. LEXIS 76213, *11 (E.D. Cal. Apr. 26, 2022); *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) ("Federal registration provides prima facie evidence of the mark's validity and entitles the plaintiff to a strong presumption that the mark is a protectable mark.").

     Here, NBC does not dispute (nor can it dispute) that DMC holds several valid federally registered trademarks, each of which has been put at issue in the MSI, including stylized versions of the marks DELOREAN and DMC, and for DELOREAN MOTOR COMPANY. ECF 38-2 at 8 (SUF #34–38); *see also* ECF 40-61, 40-62, 40-63, 40-64, 40-65, 40-66, 40-67, 40-68, & 40-69 (the trademarks). As such, this Court must presume that DMC is the rightful owner of the trademarks at issue. *See Advanced BioTech*, 2022 U.S. Dist. LEXIS 76213, at *11.

       *ii.*  <u>*Federal courts held DMC owns the rights at issue.*</u>

     NBC misrepresents and mischaracterizes federal court decisions that have affirmed DMC's rights. Specifically, these decisions affirmed DMC's rights in connection to the DELOREAN family of trademarks, as well as affirming DMC's rights to receive royalties from NBC pursuant to the 1989 Agreement.

     In litigation brought in the United States District Court for the District of New Jersey ("New Jersey Federal Case"), the court evaluated and then affirmed in favor of DMC the very same rights challenged by NBC in the MSJ. The 2015 Settlement Agreement between the DeLorean Estate and DMC, which was the subject of the New Jersey Federal Case, states: "The Estate acknowledges DMC Texas' trademarks and rights to use the DeLorean automobile brand, and associated products and services." ECF 40-44 at 2–3. However, the DeLorean Estate then

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

challenged DMC's rights to royalties from NBC under the 1989 Agreement. In the New Jersey Federal Case, the DeLorean Estate expressly sought "a declaratory judgment that the Settlement Agreement does not give [DMC] any rights under the Universal Agreement [i.e., the 1989 Agreement], and that [the DeLorean Estate] is the rightful owner of all rights stemming from the Universal Agreement." *DeLorean v. DeLorean Motor Co. (Tex.)*, No. 18-8212 (JLL)) 2018 U.S. Dist. LEXIS 175874, *8 (D.N.J. Oct. 11, 2018).

In addressing DMC's motion to dismiss, the court in the New Jersey Federal Case examined "whether the materials licensed in the Universal Agreement were included in the Settlement Agreement." *Id.* at *9–10. The court found that the DeLorean Estate's challenge to DMC's receipt of royalties from NBC and DMC's assertion of trademark rights was within the scope of the 2015 Settlement Agreement. *Id.* at *10. Logically, this means that DMC was entitled to receive royalties from NBC under the 1989 Agreement as the holder of the DELOREAN trademarks. If DMC did not own such rights, the court would have found differently.

The court went on to find that DMC holds the rights associated with the DELOREAN trademarks, stating that "[e]ven if . . . [DMC] was not 'assigned' the Universal Agreement and [the DeLorean estate] retained some rights in same . . . [the estate] is no longer the 'sole owner of the rights.'" *Id.* at *13, n.2. This is because, in such a hypothetical, DMC would still be a rightsholder. *See id.*

The DeLorean Estate appealed, taking the matter to the Third Circuit Court of Appeals. There, the court explained:

> In 1997, DMC Texas purchased many of the assets sold in [Old] DMC's bankruptcy. These included, inter alia: inventory, good will, trade names, and other tangible and intangible assets. DMC Texas subsequently registered two trademarks: one of the stylized 'DeLorean' logo on the rear bumper of the car and one of the 'DMC' logo on the front grill. As of 2018, DMC Texas sold automobiles, automobile parts, clothing, video game licenses, commercial licenses, and various other merchandise. It also licensed its trademarks to various companies.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1   *DeLorean v. DeLorean Motor Co. Tex. (In re DeLorean)*, 792 F. App'x 227, 229

2   (3d Cir. 2019). Furthermore, the Third Circuit found that "[t]he Settlement

3   Agreement incorporates the subject matter of the Universal Agreement." *Id.* at 231.

4   These statements clearly recognize DMC's long-established rights.

5        The Third Circuit expressly discussed and affirmed the very rights challenged

6   here, holding that the 2015 Settlement Agreement "recognizes DMC Texas's rights

7   to use [the DELOREAN] marks in the future" and that such rights "include the

8   enforcement of DMC Texas's marks and licenses to those marks." *Id.*

9        While it is true that the Third Circuit did not offer a determination on whether

10   there was an assignment of contractual rights by the Estate to DMC, it did not need

11   to. Instead, the Third Circuit expressly found that DMC's "dealings with Universal

12   fall within its 'worldwide rights . . . to use, register, and enforce' [its] marks in

13   connection with its business or brand." *Id.* Put simply, whether or not the DeLorean

14   Estate assigned any contractual rights was immaterial, as DMC had taken its own

15   steps to acquire these rights anyway (through use of the marks in commerce) and

16   such rights thereby entitle DMC to receive royalties from NBC per the 1989

17   Agreement. *See id.* (also holding that "the demand that Universal pay DMC Texas

18   for the use of marks for which it has 'worldwide rights' falls within its business of

19   licensing and enforcing the licenses to its marks and other intellectual property.").

20        Moreover, DMC never argued that the DeLorean Estate assigned contractual

21   rights under the 1989 Agreement to DMC. *See* ECF 40-55 at 5–6 ("DMC has never

22   alleged, as Plaintiff suggests, that the Settlement Agreement assigns DMC rights to

23   the Universal Pictures Contract. Rather, as articulated in its moving papers, DMC is

24   the unquestionable 'successor[] and assign[]' to the intellectual property at issue in

25   the Universal Pictures Contract. Thus, per its terms, the Universal Pictures Contract

26   inures to the benefit of DMC."). Thus, DMC holds rights under the 1989 Agreement

27   as a successor in interest to John Z. DeLorean and the assignee of intellectual

28   property through other means. *Id.*

Incredulously, NBC now argues that these federal court decisions have no bearing on this case. However, despite being on notice of the dispute between the DeLorean Estate and DMC, NBC never objected to DMC's assertions of its rights in the New Jersey Federal Case, including the Third Circuit's finding that DMC *owns the very same rights* presently at issue in the MSJ. *See* ECF 38-2 at 16 (SUF #86) (NBC does not dispute that the DeLorean Estate contacted it about the dispute). In fact, NBC knowingly acquiesced to allowing the courts in the New Jersey Federal Case to determine DMC's rights when it stated that it would withhold royalties until the dispute was resolved. ECF 40-7 at 2. By expressly affirming that it would pay the "winner" of the dispute between DMC and the DeLorean Estate, NBC committed to paying royalties to DMC once its rights were affirmed. And those rights were affirmed by both the district court and Third Circuit.

After DMC affirmed its rights in the New Jersey Federal Case, NBC stated in a March 18, 2020, letter: "NBC[] will resume making net receipt payments (to the extent due) to [DMC] under the 1989 Merchandise Agreement now that the litigation between [DMC] and the Estate of John DeLorean . . . has concluded." ECF 40-16 at 2. NBC enclosed in that letter "a check in the amount of $29,482, payable to DMC Texas." *Id.* at 3.

Having taken that position previously, and acted in furtherance of that position for several years, NBC is now estopped from asserting that the New Jersey Federal Case has "no relevance" to the MSJ. NBC expressly conditioned its obligation to continue paying royalties on the resolution of the New Jersey Federal Case, and after that case was resolved, NBC did in fact continue paying DMC royalties. The problem is not that NBC started paying royalties, it is that NBC has not paid DMC all the royalties it owes.

iii. <u>*NBC misrepresents DMC's statements in the DeLorean Estate lawsuit.*</u>

11

NBC asserts that DMC has admitted it has no rights under the 1989 Agreement in the New Jersey Federal Case. This is a blatant falsehood that distorts DMC's statements in that case. In addressing the Estate's contention that it holds rights under the 1989 Agreement, DMC explained:

> The Universal Pictures contract clearly states it is premised upon Mr. DeLorean being the 'the 'sole owner of the rights in the Material granted' and that Mr. DeLorean 'has the unrestricted right and power to grant the rights in the Material specified.' This, however, is unquestionably no longer the case, as acknowledged in the Settlement Agreement. Thus, if [the Estate] did have rights to the contract with Universal Pictures, it would now be void and unenforceable. This is the purpose of the provision which states that the Settlement Agreement 'does not conflict' with any other agreements.

ECF 40-55 at 13–14. DMC made the same assertion in its appellate brief as an argument in the alternative, which addressed the hypothetical of whether the DeLorean Estate still held any rights—it did not. ECF 40-58 at 32.

The DeLorean Estate had argued that it had intellectual property rights and the right to royalties under the 1989 Agreement. This led to DMC's explanation above, which shows that if the DeLorean Estate had the rights it claimed to have— which it did not and which the New Jersey District Court and Third Circuit ruled it did not—then there were serious issues with the premise of the 1989 Agreement. NBC's selection of DMC's prior statements in the New Jersey Federal Case proves to be nothing more than a deceptive cherry-picking exercise by which NBC has taken entire words and phrases out of context in hopes of giving them a totally different meaning.

In the end, DMC's prior statements do not matter, as after the conclusion of the New Jersey Federal Case, NBC affirmed its duties under the 1989 Agreement and ratified its obligations as a licensee of DMC's DELOREAN trademarks. As stated above, after conclusion of the New Jersey Federal Case, NBC agreed to "resume making net receipt payments (to the extent due) to [DMC] under the 1989

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Merchandise Agreement." ECF 40-16 at 2. And NBC did in fact continue paying royalties to DMC as a licensee under the agreement. *See* ECF 43-3. NBC's undisputed conduct ratified its contractual duties to DMC. *See Fuentes v. Empire Nissan, Inc.*, 90 Cal. App. 5th 919, 933 (2023) (an "agreement can be found from conduct that ratifies or impliedly accepts the deal").

### iv. *DMC independently established its own rights in the subject trademarks.*

In 1997, DMC acquired all DeLorean automobile inventory, goodwill, trade names, other intangible assets, distribution rights, parts, tools, stock, molds, drawings, and equipment. ECF 40-54 at 4; ECF 40-46 at 4; Declaration of Stephen Wynne ("Wynne Dec.") ¶ 7; Declaration of Marvin Katz ("Katz Dec.") ¶¶ 3–6. NBC does not dispute that DMC acquired these assets in 1997. ECF 38-2 at 7 (SUF #29–31). DMC sold used cars, parts, and accessories, and offered servicing and restoration, for the DeLorean car starting in 1995. ECF 40-46 at 4; Wynne Dec. ¶¶ 5–6. DMC also started selling new-build DeLorean cars in 2008. Wynne Dec. ¶ 8. NBC offers no argument disputing these facts. NBC does not dispute that DMC began registering several trademarks with the USPTO in 2009, including the DELOREAN-related trademarks at issue in the MSJ. *See* ECF 38-2 at 8 (SUF #35–38).

DMC's acquisition of good will and trade names, valid registered trademarks, and decades-long business is sufficient to establish its rights in the DELOREAN trademarks at issue. And DMC did in fact establish its rights sufficient for the USPTO when it obtained its registered trademarks.

### v. *NBC cannot challenge DMC's rights after recognizing them and expressly making royalty payments under the 1989 Agreement.*

NBC does not dispute that, for years, it paid DMC (some) royalties pursuant to the 1989 Agreement based on DMC's ownership of the DELOREAN marks and trade dress. *See* ECF 38-2 at 9–12 (SUF #42–44, 46–66). After DMC prevailed on

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

the second lawsuit brought by the DeLorean Estate, NBC represented to DMC that it would "resume making net receipt payments (to the extent due) to [DMC] under the 1989 Merchandising Agreement." ECF 40-16 at 2. In other correspondence NBC represented that it "has never refused to pay royalties to DMC Texas under the 1989 Agreement." ECF 40-15 at 4. NBC asserts that it only ever made payments to DMC subject to an asserted "reservation of rights." *See* ECF 38-1 at 13. But a review of the correspondence cited by NBC reveals no such reservation, express or implied. ECF 40-16 at 2; ECF 40-15 at 4.

Given NBC's admissions and payment of royalties to DMC for several years (all with the understanding that such royalties were being paid under the 1989 Agreement), it cannot now challenge DMC's rights. "Under the doctrine of licensee estoppel, during the course of the license, a licensee is estopped from claiming it owns or disputing the validity of the licensor's trademark." *Chrysler Motors Corp. v. Alloy Auto. Co.*, 661 F. Supp. 191, 192 (N.D. Ill. 1987). "The basis for this rule is that a licensee who freely enters into a license and pays royalties or agrees to the limitations imposed by a licensor effectively recognizes that the licensor possesses a valid trademark." *Id.* at 192–93. "'[A] licensee should not be permitted to enjoy the benefits afforded by the license agreement while simultaneously urging that the trademark which forms the basis of the agreement is void.'" *Philippe Charriol Int'l Ltd. v. A'lor Int'l Ltd.*, No. 13CV1257-MMA-BGS, 2014 U.S. Dist. LEXIS 200727, at *11–12 (S.D. Cal. Apr. 10, 2014).

Additionally, NBC's conduct ratified its duties to DMC under the 1989 agreement. *See Fuentes*, 90 Cal. App. 5th at 933.

Here, NBC *was and is* a trademark licensee under the 1989 Agreement because it assumed the duty to pay royalties as a licensee to DMC for several years. *See* ECF 38-2 at 9–12 (SUF #42–44, 46–66). NBC affirmed its position as a licensee, with an obligation to pay DMC royalties in connection to the license. *See* ECF 40-16 at 2–3. NBC's corporate representative also admitted that its royalty payments to

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  DMC were predicated on the 1989 Agreement. Behle Dec. ¶ 11, Ex. 5 (Sohn
2  Deposition at 46:7–22, 48:10–17).

3      In the deposition of Sohn—who is one of NBC's vice-presidents—he testified
4  that he had to review the 1989 Agreement in order for NBC to account to and pay
5  royalties to DMC. *Id.* (Sohn Deposition at 31:15–33:15). If NBC was not bound by
6  the 1989 Agreement and did not have a duty to pay and account to DMC under that
7  agreement, then NBC would not have had to refer to the agreement's terms when
8  accounting to and paying DMC. However, the opposite is true. For NBC to try to
9  fulfill its obligations to DMC, it, by its own admission, had to rely on and refer to
10 the 1989 Agreement. *See id.* One of NBC's other 30(b)(6) witnesses gave similar
11 deposition testimony that, in connection to paying royalties to DMC, NBC "pay[s]
12 based on the contract with [DMC]." Behle Dec. ¶ 12, Ex. 6 (Minasian Deposition at
13 46:2–15).

14     Given that NBC voluntarily assumed its duties to DMC under the 1989
15 Agreement and relied on that agreement for its accounting and payments to DMC,
16 it cannot now argue that the 1989 Agreement imposes no duties on it or grants no
17 rights to DMC.

18     vi.  *NBC's "true-up" royalty payments made from 2017 through 2021, as*
19         *well as its continuing tender of performance under the 1989*
20         *Agreement through 2021, precludes its statute of limitations defense.*

21     NBC claims that DMC's breach of contract claim may only recover damages
22 from after October 26, 2018—i.e., from four years before this action. However, this
23 is red herring. Critically, NBC undertook a retrospective accounting of unpaid
24 DELOREAN royalties between 1994 and 2016 (a period of 22 years), in an attempt
25 to "true-up" its royalty payment obligations to DMC during that period. *See* ECF
26 40-41 at 2; ECF 40-42 at 2; ECF 43-1 (NBC accounting statement for amount due
27 to NBC for period of April 1, 1994, to December 31, 2016); ECF 40-16 at 2–3
28

15
**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

(March 18, 2020, letter from NBC agreeing to provide accounting and royalty payments after dispute between DeLorean Estate and DMC resolved).

When DMC pointed out missing entries in NBC's initial "true-up" report, NBC continued to revise its accounting of royalties owed to DMC during this time period and continued to issue payments to DMC until August 2021. *See id.*; ECF 43-2 & 43-3 (additional accounting statements). Given NBC's acts in further of its acknowledged duty to account and pay DMC in accordance with the terms of the 1989 Agreement (including the 5% royalty rate), NBC is estopped from asserting that the statute of limitations limits DMC's contract claim to only four years before the filing of the Complaint. NBC voluntarily undertook the 22-year "true-up" accounting. Having done so, it cannot now escape liability for having performed that work in breach of the 1989 Agreement. The tendered performance by NBC covered a 22-year period. That tendered performance began in 2017 and continued through 2021, but was never resolved (resulting in the current lawsuit). Thus, even though the royalties covered a 22-year period, because NBC paid these royalties (albeit inaccurately) between 2017 and 2021, DMC's right to challenge the accuracy of the royalty calculation and payment during the 22-year period is not time barred.

"A defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the action until after the statute has run." *Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 652 (2003). "One cannot justly or equitably lull his adversary into a false sense of security, and hereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." *Id.* (internal quotations omitted). "In the usual case, estoppel is a question of fact to be resolved by the trier of facts." *Id.*

Here, NBC's continuing obligation to provide a true and accurate accounting for royalties owed to DMC from April 1, 1994, to the present—which it voluntarily

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

undertook—and the fact that it continued to provide *revised* accountings are sufficient to preclude a statute of limitations defense. *See id.* DMC relied on NBC's representations that NBC "was looking into" the questions DMC raised such that, instead of filing a lawsuit right away, it gave NBC a chance to demonstrate the accuracy and completeness of the accountings, something NBC still has not done. *See* ECF 40-2, 40-3, 40-16, 40-43, 43-1, & 43-2. During the time when NBC assured DMC that it would "true-up" past due royalties, DMC was induced to and did refrain from suing. But NBC failed to provide an accurate true-up, after years of back and forth, ultimately resulting in the present suit.

Moreover, "when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract." *Romano v. Rowell Internat., Inc.*, 14 Cal. 4th 479, 489 (1996). Thus, DMC had the option of resolving NBC's performance issues or suing for breach. DMC chose to confer with NBC on the accounting and royalty issues, but finally realized that such issues could not be fixed after NBC stopped all royalty payments in 2021. NBC voluntarily undertook a multi-decade royalty accounting and its performance—although partial—precludes the statute of limitations. Accordingly, the accuracy of that accounting, and corresponding royalties owed, is subject to challenge by DMC within four years of the last accounting, which was August 2021. ECF 43-6

        *vii.*   <u>*NBC breached the 1989 Agreement and failed to pay DMC royalties it agreed to pay.*</u>

For years, NBC provided accounting statements and paid royalties to DMC pursuant to the 1989 Agreement. *See* ECF 43-8 (March 18, 2020, letter from NBC agreeing to provide accounting and royalty payments to DMC after dispute between DeLorean Estate and DMC resolved); ECF 43-1, 43-2, 43-3, 43-4, 43-5, and 43-6 (accounting statements generated by NBC for amounts it determined were owed to

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

DMC under the 1989 Agreement). However, that all stopped after the final royalty payment in August 2021. *See* ECF 43-6 (final accounting statement).

NBC does not dispute that it continues to make money from the use of DMC's trademarks by it and by third parties it licenses. In fact, Exhibit 14 offered by NBC in support of its MSJ discloses that it continues to make substantial revenue from DeLorean merchandise and commercial tie-ups (ECF 43-7), of which it must pay DMC 5% of its net receipts generated per the 1989 Agreement (ECF 40-1 at 3). Exhibit 14 purportedly contains revenue from DeLorean merchandise and commercial tie-ups from 2017 to the third quarter of 2022. *See* ECF 43-7. Just this data alone shows that DMC has been significantly underpaid by NBC. 5% of the revenue listed in Exhibit 14 is much more than NBC has paid to DMC throughout the parties' relationship.[3] *See* ECF 43-7.

Furthermore, Exhibit 14 discloses that NBC brought in significant licensing revenue between the third quarter of 2021 and third quarter of 2022—i.e., after the last payment DMC received in August 2021. ECF 43-7. DMC has not been paid any royalties under the 1989 Agreement in connection to this revenue. Wynne Dec. ¶ 19.

Additionally, there is no dispute that products licensed by NBC featuring DMC's trademarks continue to be sold to this very day. When searching online, it takes little effort to find dozens of examples of products currently sold by NBC, or third-party licensees, that feature DMC's trademarks. *See* Wynne Dec. ¶¶ 21–24, Exs. 1–4. Yet, NBC remits no payments to DMC for the sale of these products. *Id.* at ¶¶ 21–25. Additionally, NBC has paid nothing to DMC for the use of DMC's trademarks at Universal Studios theme parks. *Id.* at ¶ 26.

In correspondence between the parties, DMC identified other instances of the trademarks being used or licensed, but no accounting was made to DMC. For example, in June 2017, DMC identified twenty-three instances or potential instances

---

[3] DMC will not discuss specific numbers from Exhibit 14, as it has been filed under seal.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

of use of its trademarks. ECF 40-2 at 2–3. While this did lead to a payment of $27,363, NBC at that time provided no explanation for why certain products, brands, or licensees were accounted for and which were not. DMC provided other examples of use of its trademarks in an email on September 25, 2017. ECF 40-3 at 2–3. NBC promised to "look into this additional data." *Id.* However, as far as DMC knows, and as far as the record shows, NBC did nothing.

DMC also provided NBC with a guide to *Back to the Future* memorabilia from 1985–2015 titled "Back to the Future Almanac," which contained dozens of examples of DMC's DELOREAN trademarks being featured in *Back to the Future* products, either sold by NBC or licensed by NBC to third-parties. *See* ECF 40-20, 40-21, & 40-22. DMC has received no royalties for many of these products. Wynne Dec. ¶ 28.

NBC continuously failed to provide DMC with information it requested which was necessary to determine whether NBC's accountings were accurate and complete. In fact, NBC refused to disclose to DMC how much of its DELOREAN-related revenue was disqualified by NBC for reporting and payment to DMC. Behle Dec. ¶ 12, Ex. 6 (Minasian Deposition at 37:6–39:11). And NBC failed to obtain input from DMC as to whether a DELOREAN-related product was reportable to DMC for royalties, even though NBC claimed it wanted to be "fair" to DMC. *Id.* (Minasian Deposition at 47:2–49:6).

Given the above evidence, for NBC to say that it did not breach the 1989 Agreement or that DMC suffers no damages is nonsensical. NBC provides no evidence that it continued to pay DMC royalties under the 1989 Agreement after August 2021. There is clear evidence in the record—such as NBC's Exhibit 14—showing that it continued to earn revenue from DMC's trademarks, but never paid DMC. Further, there are disputed issues of fact as to whether NBC provided full accountings and payments to DMC from April 1, 1994, to the present as promised. Summary judgment is clearly not warranted in such circumstances.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

### C. The accounting claim survives.

DMC's accounting claim is predicated on its breach of contract claim. *See* ECF 10 at 10. Because there are disputed issues of fact as to the breach of contract claim and evidence and law refuting NBC's arguments, the accounting claim should not be dismissed.

### D. There are disputed issues of fact as to the trademark and trade dress infringement claim.

#### i. *DMC may bring contract and infringement claims.*

NBC argues that DMC has no rights under the 1989 Agreement and that certain uses of DMC's trademarks are outside the scope of that agreement such that, even if the agreement did apply, NBC does not have to pay DMC. For example, NBC asserts that use of DMC's trademarks at its Universal Studios theme parks does not fall under the 1989 Agreement and refuses to pay DMC any compensation for that use. *See* ECF 40-5 at 2–3. Given these circumstances, it is no wonder why DMC must bring both breach of contract and trademark infringement claims to ensure that its rights are protected in this action.

Case law is clear that "[a] licensee may infringe the licensor's trademark where it exceeds the scope of the license." *BD Performing Arts v. B.A.C. Musical Instruments, LLC*, No. 22-cv-02050-JSW, 2022 U.S. Dist. LEXIS 74787, at *7 (N.D. Cal. Apr. 25, 2022).

In the present case, NBC has historically taken a narrow position as to what goods/services are subject to a royalty under the 1989 Agreement and continues to do so. In the parties' dealings, NBC narrowly defined "merchandising and commercial tie-ups" to be limited to games, toys, apparel, and the like. *See* ECF 40-4 at 2 (NBC refusing to engage in DMC's requests regarding the use of DMC's trademarks at Universal Studios theme parks); ECF 40-5 at 2–3 (January 26, 2018, letter from NBC to DMC, asserting that use of trademarks at theme parks is not covered by the parties' agreement). Accepting NBC's narrow interpretation of the

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1989 Agreement means that it is using DMC's trademarks and trade dress outside the scope of the license. For example, NBC does not dispute that it used DMC's trademarks at its theme parks and, yet, has paid DMC nothing for this use. *See id.* Thus, an infringement claim must be brought.

Moreover, even if the breach of contract and infringement claims are inconsistent, they may be prosecuted in the alternative. *See* Fed. R. Civ. P. 8(d). Presently, NBC's position is that DMC has zero rights under the 1989 Agreement. Taking that as true—it is not—then there is no issue with the infringement claim. NBC's own defenses require that DMC assert all available claims, even those that may be inconsistent, to protect DMC's rights.

### ii.   *NBC's attempt to challenge DMC's trademark fails.*

As stated above, DMC's "[f]ederally registered trademarks have a presumption of ownership and priority." *Advanced BioTech*, 2022 U.S. Dist. LEXIS 76213 at *11. Further, by expressly entering into the 1989 Agreement as a licensee and by paying royalties to DMC as a licensee, NBC "is estopped from claiming it owns or disputing the validity of [DMC's] trademark." *Chrysler*, 661 F. Supp. at 192; *Philippe*, 2014 U.S. Dist. LEXIS 200727, at *11–12. The undisputed evidence shows that NBC acted as a licensee for several years, making payments to DMC as licensor.

The fact that NBC chose to make a DELOREAN vehicle into "time machine" for the *Back to the Future* films does not make it a senior user of the trademarks. "While a licensee's use of a mark might contribute to the mark's commercial meaning and build up goodwill, that meaning and goodwill all accrue to the mark's owner, not to the licensee." *City-Core Hosp., LLC v. Palmer*, No. 17-cv-05544-CRB, 2018 U.S. Dist. LEXIS 6140, *5 (N.D. Cal. Jan. 12, 2018). "The licensee is only renting the licensor's own goodwill. In other words, the licensor is the origin of the mark—i.e., the 'source of the goodwill inhering in [it].'" *Id.*

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    NBC's predecessors originally entered into the 1989 Agreement with John Z.

2   DeLorean, recognizing that they (the predecessors) did not own any of the

3   DELOREAN-related trademarks and did not possess any related rights. ECF 40-1.

4   Once DMC contacted NBC in 2017, NBC voluntarily continued its role as licensee

5   under the 1989 Agreement by paying royalties to DMC. *See* ECF 40-16 at 2–3; ECF

6   43-1, ECF 43-2, & 43-3 (NBC accounting statements). NBC never disputed its role

7   as licensee and does not presently dispute that it made payments to DMC as a

8   licensee under the 1989 Agreement. *See* ECF 38-2 at 9–12 (SUF #42–44, 46–66).

9   Given this, NBC cannot now argue that it holds any rights in the trademarks it was

10   only using and licensing as a licensee.

11               *iii.   There is a clear likelihood of confusion.*

12      As part of an infringement action, "a plaintiff must . . . show that the

13   defendant's use of the mark or name creates a likelihood of confusion." *Rearden*

14   *LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1198–99 (9th Cir. 2012). While the

15   burden on NBC is already heavy under the summary judgment standard, its burden

16   is even heavier when challenging this element of DMC's infringement claim.

17   "Because the determination is based on a non-exhaustive, multi-factor, fact-

18   intensive inquiry, [the Ninth Circuit] ha[s] cautioned against granting summary

19   judgment in these cases." *JL Bev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098,

20   1105 (9th Cir. 2016); *Rearden*, 683 F.3d at 1210. Accordingly, where "conflicting

21   facts render it unclear whether there was a likelihood of consumer confusion,

22   summary judgment is inappropriate." *JL Bev. Co.*, 828 F.3d at 1106.

23      It is no wonder that summary judgment on the likelihood of confusion element

24   is so disfavored when there are eight fact-based factors a court may consider. These

25   factors are: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of

26   the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type

27   of goods and the degree of care likely to be exercised by the purchaser; (7)

28

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  defendant's intent in selecting the mark; and (8) likelihood of expansion of the
2  product lines." *Rearden*, 683 F.3d at 1209.

3         "It is well established that this multi-factor approach must be applied in a
4  flexible fashion," as they "are intended to function as a proxy or substitute for
5  consumer confusion, not a rote checklist." *Id.* "A determination may rest on only
6  those factors that are most pertinent to the particular case before the court, and other
7  variables besides the enumerated factors should also be taken into account based on
8  the particular circumstances." *Id.*

9         Here, these factors weigh against summary judgment. First, there is no dispute
10 over the strength of DMC's trademarks. The "DMC" and "DeLorean" marks are
11 recognizable and well known to the public Wynne Dec. ¶ 12. The DeLorean
12 automobile itself is a one-of-a-kind car that has become a pop culture icon. *Id.*
13 Moreover, the fact that NBC continues to make substantial sums of money from
14 licensing DMC's DeLorean-related trademarks shows that such marks have
15 significant strength in the marketplace. *See* ECF 43-7 (NBC's Exhibit 14; listing out
16 revenue generated from DeLorean merchandise and commercial tie-ups).

17        Second, NBC does not dispute that it directly uses DMC's trademarks and
18 licenses those marks out to third parties. Thus, the DeLorean branding in products
19 sold by NBC and licensed by NBC to third-parties is unquestionably similar to
20 DMC's trademarks.

21        Third, while it is true that DMC and NBC sell separate goods (DMC is in the
22 automobile business and NBC is primarily an entertainment company), both license
23 out the DeLorean-related trademarks. Wynne Dec. ¶ 9. This is a service offered by
24 both entities for the subject trademarks. And there has been actual confusion
25 regarding the licensing of DMC's trademarks and the licensing of NBC's DeLorean
26 "time machine" from the *Back to the Future* films. *See* Declaration of James Espey
27 (Espey Dec.") ¶¶ 7–11, Exs. 2–5.

28

Fourth, NBC's intent in selecting the mark strongly weighs in favor of the likelihood of confusion element. "When a person knowingly adopts a mark identical to another's mark, the Court may infer that person's intent to confuse." *Adobe Sys. v. Kern*, No. C 09-1076 CW (JL), 2009 U.S. Dist. LEXIS 123566, *13 (N.D. Cal. Nov. 24, 2009); *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) ("When the alleged infringer knowingly adopts a mark similar to another's, we must presume that the public will be deceived.").

From at least January 2017 when a representative of DMC first contacted NBC about DMC's trademarks (ECF 40-1), NBC was on notice that it was using and licensing to third-parties the DELOREAN-related marks owned by DMC. Additionally, NBC's intent in using DMC's trademarks is clearly so that it can sell and license DELOREAN-related products. NBC is not using the marks in contexts that do not involve the DELOREAN automobile. NBC's infringement thus implicates DMC's very business and its own use of its marks.

Finally, there is evidence of actual confusion, which, at the very least, shows there is a dispute of material fact. "Evidence that use of a mark or name has already caused actual confusion as to the source of a product is 'persuasive proof that future confusion is likely.'" *SafeWorks, LLC v. Teupen Am., LLC*, 717 F.Supp.2d 1181, 1191 (W.D. Wash. 2010) (quoting *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979)). In *SafeWorks*, there were "at least three incidents of actual confusion." *Id.* The court explained that "[b]ecause proving actual confusion is so difficult, the lack of other evidence of actual confusion is not significant." *Id.* As such, the evidence of a small number of instances of actual confusion "weigh[ed] strongly in favor of a finding of likelihood of confusion." *Id.*

Here, for decades, DMC has received inquiries by members of the public which conflate DMC's business and trademarks on the one hand with the fictional DeLorean time machine on the other hand. Espey Dec. ¶ 3. DMC has been contacted by individuals who believe that DMC owns the rights to the fictional DeLorean time

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

machine and can license out the time machine for various purposes. *Id.* at ¶¶ 4, 8–11, Exs. 2–5. Others have approached DMC believing that it sells DELOREAN automobiles in the style of the time machine—i.e., with all the accessories added to the car in the Back to the Future films. *Id.* at ¶¶ 4–5, Ex. 1 (Inquiry to DMC asking about the manufacture of a "standard Delorean and the Back To The Future model with the accessories all over it.").

The relevant factors all show that there is, at the very least, a disputed issue of fact as to consumer confusion.

Moreover, given that this case involves a dispute between a licensor (DMC) and a licensee (NBC), these factors are not necessarily determinative for the consumer confusion element. This is because the analysis is generally different "[i]n a dispute between a licensee and licensor." *Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F. Supp. 2d 1061, 1065 (N.D. Cal. 2008). "Where a licensee persists in the unauthorized use of a licensor's trademark, courts have found that the continued use alone establishes a likelihood of consumer confusion." *Id.* Here, as demonstrated above, NBC clearly persists in its unauthorized use of DMC's trademark by using the marks without compensation to DMC. For example, there is no dispute that NBC continues to earn substantial revenue from the DeLorean-related licenses and products (see NBC's Exhibit 14; ECF 43-7) but has not paid DMC any royalties since August 2021. ECF 43-6; Wynne Dec. ¶ 19.

## IV.   CONCLUSION

There are significant disputed issues of fact regarding royalties paid to DMC and NBC's contractual obligations. As such, DMC respectfully requests the Court deny the MSJ.

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  DATED: January 22, 2024          **FOLEY BEZEK BEHLE & CURTIS, LLP**

2

3

4                                   By: /s/ *Roger N. Behle, Jr.*
5                                        Roger N. Behle, Jr.
                                         Jordan A. Liebman
6                                        *Attorneys for Plaintiff DMC*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**